# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JAMES BOCOCK, VENTURI )
ANDERSONI, LLC, JOHN N. KYLE )
II, KRISTINA C. BRUNI, PAUL )
DESTEFANIS, PAULA ABERLE, )
MICHAEL DAGEN, ENTRUST )
FREEDOM/YVONNE WOOD, )
EQUITY TRUST/J.M. HUISINGA, )
IRWIN PODHAJSER, JAMES )
GALLAGHER, JONATHAN )
HEISTEN, LINDA KLINK, MICHAEL )
L. ROBERTS, PAVAN ANAND, )
PHYLLIS COHEN, RONALD R. )
TILLER, TYLER WOOD, STEPHEN )
CLAASSEN, MICHAEL TANIELIAN, )
FRANK NEVES, JOHN D. ROEHRS, )
STAN V. SMITH ON BEHALF OF )
THE STAN V. SMITH TRUST )
DATED APRIL 30, 1993, ROBERT A. )
BEAN, RICHARD CAREY, and )
ALLEN WHITMORE, )
)
        Plaintiffs, )
)
      v. ) C.A. No. 2021-0224-PAF
)
INNOVATE CORP., HC2 )
BROADCASTING HOLDINGS INC., )
HC2 BROADCASTING INC., )
CONTINENTAL GENERAL )
INSURANCE COMPANY, PHILLIP )
A. FALCONE, MICHAEL J. SENA, )
WAYNE BARR, JR., LES LEVI, )
PAUL K. VOIGT, AND IVAN P. )
MINKOV, )
)
        Defendants. )

# MEMORANDUM OPINION

Date Submitted: July 20, 2022
Date Decided: October 28, 2022

John G. Harris, David B. Anthony, BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiffs James Bocock, Venturi Andersoni, LLC, John N. Kyle II, Kristina C. Bruni, Paul Destefanis, Paula Aberle, Michael Dagen, Entrust Freedom/Yvonne Wood, Equity Trust/J.M. Huisinga, Irwin Podhajser, James Gallagher, Jonathan Heisten, Linda Klink, Michael L. Roberts, Pavan Anand, Phyllis Cohen, Ronald R. Tiller, Tyler Wood, Stephen Claassen, Michael Tanielian, Frank Neves, John D. Roehrs, Stan V. Smith on behalf of The Stan V. Smith Trust, Robert A. Bean, Richard Carey, and Allen Whitmore.*

Kevin G. Abrams, J. Peter Shindel, Jr., April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Defendants INNOVATE Corp. (f/k/a HC2 Holdings, Inc.), HC2 Broadcasting Holdings Inc., HC2 Broadcasting Inc., Michael J. Sena, Wayne Barr, Jr., Les Levi, and Ivan P. Minkov.*

Martin S. Lessner, Daniel M. Kirshenbaum, M. Paige Valeski, Wilmington, Delaware, YOUNG CONAWAY STARGATT & TAYLOR, LLP; Beth I. Z. Boland, FOLEY & LARDNER LLP, Boston, Massachusetts; Chelsea L. Hilliard, FOLEY & LARDNER LLP, Dallas, Texas; *Attorneys for Defendant Continental General Insurance Company.*

Stephen C. Norman, Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Eric Landau, Travis Biffar, ELLENOFF GROSSMAN & SCHOLE LLP, Irvine, California; *Attorneys for Defendant Philip A. Falcone.*

Kurt M. Heyman, Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Attorneys for Defendant Paul K. Voigt.*

**FIORAVANTI, Vice Chancellor**

In November 2017, HC2 Holdings, Inc. (now Innovate, Inc. or "Innovate") acquired a controlling stake in DTV America Corporation ("DTV America"). It acquired that stake through a stock purchase agreement with several DTV America stockholders, many of whom are plaintiffs in this action. Both Innovate and DTV America were and are in the television broadcasting business.

After the transaction closed, Innovate designated as DTV America officers and directors certain of its or its affiliates' officers and directors. The plaintiffs allege that Innovate's acquisition of control was part of a scheme by Innovate, its affiliates, and the DTV America officers and directors to loot DTV America. According to the alleged scheme, Innovate usurped for itself valuable corporate opportunities that DTV America had identified, transferred DTV America broadcast licenses to Innovate's affiliates for little to no consideration to DTV America, and forced DTV America to enter into agreements with Innovate that drained DTV America of its value. Plaintiffs allege that this scheme culminated in Innovate offering to buy the remaining shares of DTV America from the plaintiffs on the cheap.

The plaintiffs comprise stockholders and option holders of DTV America. They have asserted a variety of claims, including fiduciary duty claims against officers and directors of DTV America and Innovate and certain of its affiliates as DTV America's controlling stockholders. The complaint also seeks to hold these

same defendants liable under theories of aiding and abetting and civil conspiracy. The last claim is by holders of DTV America stock options, who allege that the same fiduciary duty breaches underlying the stockholder plaintiffs' derivative claims give rise to a direct tortious interference claim for devaluing the stock options.

The defendants have moved to dismiss. Before addressing the factual background and the merits, a few words about the complaint and the plaintiffs' legal theories are in order. To put it charitably, the complaint is unfocused and short on well-pleaded facts. It is the classic, unappetizing "pizza on the wall." For example, the complaint lumps all of the individual defendants together as "Conspirators." The complaint purports to allege claims as to dozens of events, but, as to most of them, the complaint does not identify when they occurred, who the decision makers were, or any of the transaction details. The complaint alleges that five of the six individual defendants served as DTV America officers, directors, or both, at varying times, but is vague as to the duration of their service. In other words, it is impossible to discern who served on the board at the time of some of the challenged transactions. The complaint alleges both direct and derivative claims covering identical conduct, but the direct claims do not pass the straight-face test, and the plaintiffs conceded as much by not briefing the issue.

Delaware is a notice-pleading state. All reasonable inferences are to be drawn in favor of the plaintiffs on a motion to dismiss. The court applies that standard here.

2

None of the more than 20 plaintiffs utilized the tools at hand under 8 *Del. C.* § 220 to obtain basic facts about the transactions that they challenge. That failure is not fatal, but the court is left with a complaint that for the most part lacks well-pleaded facts from which reasonable inferences can be drawn. At the end of this opinion, a few claims survive. Most do not. Consequently, this opinion is longer than it should be because, "it is more time-consuming to clean up the pizza thrown at a wall than it is to throw it." *In re TransPerfect Glob., Inc.*, 2021 WL 1711797, at \*1 (Del. Ch. Apr. 30, 2021), *aff'd sub nom. TransPerfect Glob., Inc. v. Pincus*, 2022 WL 1763204 (Del. June 1, 2022).

## I.    BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the Amended Verified Complaint (the "Complaint")[1] and documents integral thereto or otherwise subject to judicial notice.

---

[1] Dkt. 30 ("Compl."). Exhibits attached to the Complaint are cited as "Ex." Both sides have submitted documents that are outside the pleadings. Some of those documents are integral to the Complaint or otherwise subject to judicial notice. Others are not. The Defendants' reliance on documents outside the pleadings raised the specter of converting the motions to dismiss into motions for summary judgment and affording the Plaintffs discovery. *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at \*17 (Del. Ch. Jan. 27, 2021). The court declines to do so. Instead, the court considers only those documents that are integral to the Complaint or otherwise subject to judicial notice. *See City Pension Fund for Firefighters & Police Officers in City of Miami v. The Trade Desk, Inc.*, 2022 WL 3009959, at \*9 (Del. Ch. July 29, 2022).

## A.    The Parties

The plaintiffs are 22 purported stockholders or option holders of DTV America Corporation ("DTV America" or the "Company").  They are collectively referred to as "Plaintiffs."[2]  Counts I through VI are asserted on behalf of a group defined as the "Stockholder Plaintiffs."[3]  Plaintiffs James Bocock and Venturi Andersoni, LLC (the "Derivative Plaintiffs") represent that they have "continuously held DTV America stock at all times pertinent to the derivative claims averred in this action and remain stockholders of record."[4]  The "Option Holder Plaintiffs" are John N. Kyle II, Kristina C. Bruni, Paul DeStefanis, Michael Dagen, Irwin Podhajser, Paula Aberle, Robert A. Bean, and James Bocock.[5]  Many of the plaintiffs are former officers, directors, or employees of DTV America.

DTV America owns and operates low-power television ("LPTV") broadcast stations across the United States.[6]

---

[2] Compl. ¶¶ 1, 21–22.

[3] The Stockholder Plaintiffs are:  James Bocock; Venturi Andersoni, LLC; Entrust Freedom/Yvonne Wood; Equity Trust/JM Huisinga; Irwin Podhajser; James Gallagher; Jonathan Heistein; Linda Klink; Michael L. Roberts; Pavan Anand; Phyllis Cohen; Ronald R. Tiller; Tyler Wood; Stephen Claassen; Michael Tanielian; Frank Neves; John D. Roehrs; Stan V. Smith on behalf of the Stan V. Smith Trust Dated April 30, 1993; Robert A. Bean; Richard Carey; and Allen Whitmore.  *See* Ex. 1.

[4] Compl. ¶ 91.  The other Stockholder Plaintiffs do not appear to be holding themselves out as stockholders asserting derivative claims on behalf of the Company.

[5] *Id.* ¶ 22.

[6] Dkt. 45 ("Pls.' HC2 Ans. Br.") 2; *see also* Compl. ¶ 29.

4

Innovate,[7] a Delaware corporation, is a publicly traded holding company with a "diverse array of operating subsidiaries across multiple reportable segments."[8] Innovate is "the ultimate parent company of DTV America and a web of numerous other intersecting companies."[9] Among Innovate's wholly owned subsidiaries is Defendant HC2 Broadcasting Holdings Inc. ("HC2 Broadcasting"), a Delaware corporation that holds Innovate's broadcasting assets.[10] As of January 2021, HC2 Broadcasting operated over 220 broadcast television stations and owned approximately 210 silent licenses and construction permits across 130 U.S. markets.[11] HC2 Broadcasting, in turn, owns 100% of Defendant HC2 Broadcasting Inc. ("HC2 Inc."), a Delaware corporation.[12] Defendant Continental General Insurance Company ("Continental"), a Texas corporation, was at all relevant times,

---

[7] *See* Dkt. 42 (Order Regarding Name Change of Defendant HC2 Holdings, Inc.).

[8] Compl. ¶ 6.

[9] *Id.*

[10] *Id.* ¶ 7.

[11] *Id.*

[12] *Id.* ¶ 8.

a wholly owned subsidiary of Innovate.[13]  At all relevant times, Continental owned approximately 8% of DTV America's common stock.[14]

Innovate, HC2 Broadcasting, and HC2 Inc. are collectively referred to as the "Innovate Defendants."  The Innovate Defendants and Continental are referred to collectively as the "Entity Defendants."

The six remaining defendants (the "Individual Defendants") are current and former directors and officers of the Innovate Defendants.  Five of them also served at various time as directors and officers of DTV America.  Outside of the time periods described below, the specific tenure of each defendant in their alleged fiduciary roles is not apparent from the Complaint.

Defendant Phillip A. Falcone was the President and Chief Executive Officer of Innovate from May 2014 to April 2020 and the President and a director of HC2

---

[13] *Id.* ¶ 9.  Innovate sold Continental to Continental General Holdings LLC in a transaction that closed on July 1, 2021.  HC2 Holdings, Inc., Quarterly Report 21 (Form 10-Q) (June 30, 2021).  The court may take judicial notice of this fact, which is not subject to reasonable dispute.  *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC."). It is not clear what happened to Continental's equity interest in DTV America in the transaction, but the result does not matter for this decision.

[14] Compl. ¶ 9.  Continental, relying upon Innovate's filings with the United States Securities and Exchange Commission ("SEC"), argues that Continental owned 6.84% of DTV's outstanding common stock.  Dkt. 39 ("Continental Mot. To Dismiss") 5, 19.  For purposes of this decision, the court accepts the allegations of the Complaint.  Whether Continental owned 6.84% or 8% of DTV America's outstanding stock is immaterial to the outcome of this decision.

Broadcasting from October 2017 to May 2020.[15]   He served as a director of DTV America from October 2017 to May 2020.[16]  He also served as CEO, President, and Chairman of the Board of DTV America starting in November 2017.[17]

Defendant Michael J. Sena is currently the Chief Financial Officer of Innovate, an executive officer and director of HC2 Broadcasting, and a director and former Chief Financial Officer of DTV America.[18]  He has served at Innovate since June 2015 and at HC2 Broadcasting since October 2017.[19]  He served as a member of the DTV America board of directors on March 15, 2021, but the Complaint does not allege when he first joined the board.[20]

Defendant Les Levi was the Chief Operating Officer of DTV America from December 2017 to April 2018.[21]  He has served on the DTV America board of directors since November 2017 and became the managing director of business

---

[15] Compl. ¶¶ 10, 99.

[16] *Id.* ¶ 10.

[17] *Id.* ¶ 17.

[18] *Id.* ¶ 11.

[19] *Id.* ¶ 12,

[20] *Id.* ¶¶ 12, 95.

[21] *Id.* ¶ 12

strategy of DTV America in May 2020.[22]  Levi has been an officer of HC2 Holdings since 2017.[23]

Defendant Ivan P. Minkov has been the Chief Financial Officer of DTV America since April 2018 and is a current member of the board.[24]  He became an officer of HC2 Broadcasting in 2018 and a director of the same in October 2017.[25]

Defendant Wayne Barr, Jr. has served as a director of Innovate since 2014 and as its Chief Executive Officer since June 2020.[26]  He has served as the Chief Executive Officer and as a director of HC2 Broadcasting since February 2021.[27] Barr has also served as President of two non-party Innovate entities since 2018.[28] The Complaint alleges that "[s]ince November 2017" Barr "at one time, served as either a director, officer, or both of DTV America," and that he was a director as of March 15, 2021.[29]

Defendant Paul K. Voigt served as senior managing director of investments at Innovate from late 2014 to early 2018 and as a "director and/or officer of several

---

[22] *Id.*

[23] *Id.* ¶ 100.

[24] *Id.* ¶¶ 13, 17.

[25] *Id.* ¶ 98.

[26] *Id.* ¶ 15.

[27] *Id.*

[28] *Id.*

[29] *Id.* ¶¶ 17, 93

[Innovate] entities" at undisclosed times.[30]  He is not alleged to have held any position at DTV America at any time.

The Complaint alleges that Barr, Minkov, Sena, and Levi were DTV America directors at the time of the filing of the original complaint in this action on March 15, 2021.[31]

The named defendants are collectively referred to as the "Defendants."

## B.     The Entity Defendants' Acquisition of DTV America Stock

In late 2015, Innovate indirectly owed a minority equity stake in DTV America through Continental.[32]  In early 2016, Falcone and Voigt, acting as representatives of the Innovate Defendants, engaged in discussions with and obtained confidential business information about DTV America in contemplation of an additional equity investment in the Company.[33]  That information included details of valuable business opportunities available to DTV America—specifically "immediate, near term LPTV broadcast station purchase opportunities around the country."[34]  The Complaint alleges that these acquisition targets were reflected in a

---

[30] *Id.*

[31] *Id.* ¶ 93.

[32] *Id.* ¶ 26.

[33] *Id.* ¶ 32.

[34] *Id*.

"Business Plan," but the Complaint does not identify any of the targets.[35]  Plaintiffs acknowledge that Plaintiff John N. Kyle, II, DTV America's former Chief Executive Officer, created the Business Plan.[36]  The Complaint does not specify when the Business Plan was provided to any of the Innovate Defendants.  It is apparent, however, that it was provided sometime between May 2016 and June 2017.[37]

In June 2017, Innovate, through a wholly owned subsidiary, entered into private agreements with certain DTV America stockholders, including some of the Plaintiffs, to purchase their shares of DTV America common stock, representing approximately 43% of all outstanding shares (the "Purchase Agreement").[38]  The transaction closed in November 2017.[39]  As a result of these transactions, Innovate and its subsidiaries owned over 50% of DTV America's common stock by the end of 2017.

---

[35] *Id.*

[36] Dkt. 43 ("Pls.' HC2 Ans. Br.") 3.

[37] Compl. ¶ 32 (alleging that Falcone and others had continuous access to DTV America's LPTV station purchase opportunities from June 2017 to November 2017); *see* Pls.' HC2 Ans. Br. Ex. A (attaching what is alleged to be the Business Plan, dated May 2016).

[38] Compl. ¶ 27; *see* Dkt. 38 ("HC2 Defs.' Opening Br.") Ex. D.  The court can take judicial notice of this document, which was filed with the SEC and is not subject to reasonable dispute.  *See* Del. R. Evid. 201(b); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[39] Compl. ¶ 30.

At some unalleged time thereafter, Innovate entered into proxy agreements with other stockholders allowing Innovate "at all times to maintain a controlling majority."[40] The Complaint contains no facts as to these agreements or the number of shares that are subject to these agreements.

## C. Defendants' Alleged Misconduct

Plaintiffs allege that once Innovate signed the Purchase Agreement in June 2017, Innovate, its affiliates, and several of the Individual Defendants began siphoning off assets from the Company. The Plaintiffs allege that these events were part of a scheme, led by Falcone, to acquire a majority stake in DTV America and then loot DTV America of its assets and corporate opportunities, leading to Innovate's attempt to buyout the remaining minority DTV America stockholders at a deep discount.[41] In addition to Falcone, the other alleged participants in this alleged scheme were Levi, Sena, Minkov, Barr, and Voigt, to whom the Complaint refers as the "Conspirators."[42] Plaintiffs allege that beginning in November 2020, the Conspirators began to "make offers to Minority Shareholders to purchases their shares at a deep discount."[43] The allegations as to much, but not all, of the alleged

---

[40] *Id.* ¶ 116.

[41] *Id.* ¶ 1.

[42] *Id.* ¶ 31.

[43] *Id.* ¶ 78. There are no other allegations about this alleged "third and final step of the Scheme." *Id.* There are no allegations as to any offers, any representations about the offers, or whether any offers were accepted.

misconduct are sparse to nearly nonexistent. What follows is the court's attempt to categorize and describe the claims.

### 1. Usurpation of Corporate Opportunities Identified in the Business Plan

Plaintiffs allege that in the period between June 2017 and December 2020, Innovate, through subsidiaries other than DTV America, acquired over 100 LPTV stations that had been identified as DTV America acquisition targets prior to November 2017.[44] Very few of those alleged corporate opportunities are identified in the Complaint. For the most part, Plaintiffs do not identify which specific stations were purchased, when they were purchased, or which Innovate subsidiaries (party or non-party) were the purchasers. The few that are described in the Complaint are as follows:

- WFWC-CD Station Group. DTV America signed a letter of intent with Trans Star, LLC ("Trans Star") on October 19, 2017 to acquire the WFWC-CD Station Group for $225,000[45]. On February 8, 2018, HC2 Station Group, Inc.,[46] an Innovate affiliate, filed an assignment for the WFWC-CD Station

---

[44] *Id.* ¶¶ 33–34.

[45] *Id.* ¶ 35.

[46] HC2 Station Group, Inc. ("HC2 Station Group") is not a defendant in this action. *See id.* ¶¶ 13, 15, 95, 96, 98, 100.

Group with the FCC, and on April 6, 2018, the FCC approved the sale of WFWC-CD Station Group to HC2 Station Group.[47]

- Frank Digital Broadcasting. In October 2017, DTV America "negotiated a deal to purchase Frank Digital Broadcasting's LPTV stations for $65,000."[48] On April 15, 2018, HC2 Station Group filed an application with the Federal Communications Commission (the "FCC") to purchase these stations for itself for the same $65,000 purchase price.[49]

- Azteca America. In November 2017, the Innovate Defendants acquired Azteca America, a Spanish-language television programming network (the "Azteca America Acquisition").[50] The Complaint alleges that the Business Plan identified Azteca America as a potential target.[51] But the document that Plaintiffs attached to their answering brief and asserted to be the Business Plan does not mention Azteca America as a potential acquisition target.[52] Plaintiffs do not specify which of the Innovate Defendants purchased Azteca America. According to the Complaint, since the Azteca America Acquisition, DTV

---

[47] *Id.* ¶¶ 36–37.

[48] *Id.* ¶ 39.

[49] *Id.*

[50] *Id.* ¶ 40.

[51] *Id.*

[52] Pls. HC2 Ans. Br. Ex. A. Azteca America is mentioned one time in the Business Plan as among 27 networks carried on DTV America. *Id.* at 13.

America's stations have been "forced" to run Azteca America programming at "a reduced profit."[53] Plaintiffs imply that, but for an unidentified Innovate affiliate's acquisition of this company, DTV America could have and would have acquired Azteca America itself, which would have resulted in greater value to the Company.[54]

### 2. Broadcasting Licenses and Construction Permits

Plaintiffs allege that "[s]ince 2017, over 70 licenses or construction permits were transferred from DTV America and placed in the name of HC2 Station Group, Inc. . . . or another [Innovate] Entity"[55] for "little or no consideration to DTV America."[56] Plaintiffs provide no details or dates for any of these license transfers. The Complaint merely lists the station call letters, city, and state of 48 licenses.[57] According to the Complaint, the Entity Defendants have begun transferring some of these licenses back to DTV America following the commencement of this action.[58]

---

[53] Compl. ¶¶ 40, 42.

[54] *Id.* ¶¶ 41–42.

[55] *Id.* ¶ 44.

[56] *Id.* ¶ 43.

[57] *Id.* ¶ 44.

[58] *Id.* ¶ 45.

### 3. The Lowcountry Sale

On November 11, 2019, DTV America sold two LPTV stations, W26DT-D and WCGZ-LD, to Lowcountry 24 Media, LLC ("Lowcountry") for two dollars (the "Lowcountry Sales").[59] According to an application filed with the FCC, "additional consideration for the [Lowcountry] transaction is the extension of time granted by [Lowcountry] to DTV America . . . in a related transaction between the parties."[60] The "related transaction," however, did not directly involve DTV America. Instead, it involved Lowcountry's sale of a full power TV station to Innovate for $2.6 million.[61] Seven months later, Lowcountry sold W26DT-D to a third party for $200,000 and sold WCGZ-LD, along with two other licenses, to another third party for over $350,000.[62]

### 4. The Gray Media Sale

On March 12, 2021, DTV America and HC2 Broadcasting entered into an asset purchase agreement with Gray Media Group, Inc. ("Gray Media") to sell ten broadcasting station licenses to Gray Media for $475,000 (the "Gray Media Sale").[63] Six were DTV America licenses, and the other four had previously been transferred

---

[59] *Id.* ¶ 47.

[60] *Id.* ¶ 48 (modified from all capital letters in original).

[61] *Id.* ¶ 49.

[62] *Id.* ¶¶ 50–51.

[63] *Id.* ¶ 53.

from DTV America to the Entity Defendants for "no consideration."[64] The Complaint alleges on information and belief that the proceeds from the Gray Media Sale "went directly to the [Entity Defendants], and DTV America received no consideration for its licenses."[65] The Complaint alleges no facts as to whether any of the Individual Defendants had any involvement in the transaction.

### 5. TV-49

On March 17, 2021, HC2 Broadcasting sold six licenses to TV-49, Inc. ("the TV-49 Sale").[66] DTV America originally owned and has been named as licensee of four of those six licenses. DTV America was not a party to the asset purchase agreement.[67] Plaintiffs allege that the Entity Defendants and the so-called Conspirators "improperly transferred control of these licenses to HC2 Broadcasting."[68] Again, the Complaint alleges no facts as to who was involved in negotiating, approving, or effectuating the transaction.

---

[64] *Id.* The Complaint identifies these four licenses by city, state, and call letters. *Id.* ¶ 54 n.1.

[65] *Id.* ¶ 55. After the initiation of this action, HC2 Broadcasting informed the FCC that the four stations listed as being HC2, Inc. licenses should have been listed as DTV America licenses. *Id.* ¶ 56.

[66] *Id.* ¶ 59.

[67] *Id.*

[68] *Id.* ¶ 60.

### 6. Expired and Written-Off Licenses and Permits

Plaintiffs allege that, since 2017, over 115 of DTV America's licenses and construction permits have expired and are worthless.[69] In addition, as of the date of the Complaint, an additional 62 construction permits were set to expire in July 2021.[70] As a result, the alleged Conspirators "engage[d] in the large-scale selling of DTV America assets at severely depressed prices to various other broadcasters."[71] DTV America also wrote off nearly $2 million for the impairment of FCC licenses in 2019. By contrast, DTV America wrote off $319,557 in impaired licenses in 2017 and $176,119 in 2018.[72] The Complaint alleges no further facts about any of these licenses and permits. The Complaint does not identify them, and there are no allegations that any of the licenses or permits had value at the time they were written off or were allowed to expire.

### D. DTV America's Technology and Intellectual Property

Long before Innovate began discussing a transaction to acquire a controlling interest in DTV America, the Company had developed a proprietary program

---

[69] *Id.* ¶ 81.

[70] *Id.* ¶ 82. The parties have not informed the court whether such expiration actually occurred.

[71] *Id.* The court infers that the assets being sold were the soon-to-expire construction permits.

[72] *Id.* ¶ 80.

distribution platform named "DTV Cast."[73] DTV Cast "enabled TV programming from a central 'hub' to any connected TV station in the US," without the need for satellite dishes.[74] The DTV Cast platform "provides for a low cost of operation, flexibility in maintenance, remote monitoring, remote operations, and the ability to scale to hundreds of TV stations."[75] Plaintiffs allege that the Entity Defendants appropriated and rebranded this valuable technology as "Central Cast," an asset of HC2 Broadcasting, without paying any consideration to DTV America.[76] Like most of the other activities and transactions alleged to be wrongful, the Complaint does not allege when the appropriation and rebranding occurred or offer any other facts about the purported malfeasance. What they do allege, however, is that Innovate's misappropriation of the DTV Cast technology "made it possible for the [Entity Defendants] to go on a $150,000,000 acquisition spree to purchase stations, starting in November 2017."[77] The only reasonable inference to draw from this allegation is that the wrongful misappropriation of DTV Cast occurred at or before the beginning of the "acquisition spree."

---

[73] *Id.* ¶ 73.

[74] *Id.*

[75] *Id.*

[76] *Id.* ¶ 74.

[77] *Id.* ¶ 75.

## E. FCC Repacking

The FCC periodically "repacks" television stations in order to efficiently utilize the spectrum of airwaves.[78] This practice reshuffles stations via an incentive auction process, in which some stations voluntarily relinquish spectrum usage rights in exchange for payment from the FCC, those rights are resold to mobile broadband providers, and the remaining television stations are reorganized to occupy a smaller portion of the spectrum.[79] Stations are reshuffled regardless of whether they chose to participate in the reverse auction.[80]

Plaintiffs allege that, after the Entity Defendants acquired a controlling ownership interest in DTV America in November 2017, they "took the best open and available channels that were repacked by the FCC from DTV America and diverted those stations to other wholly owned subsidiaries of [Innovate]."[81] Plaintiffs do not identify the channels diverted or the entities to which they were transferred, nor do they offer facts to support their assertion that these channels were "the best open and available channels."

---

[78] *Id.* ¶ 76. *See* Comment Sought on Competitive Bidding Procedures for Broadcast Incentive Auction 1000, Including Auctions 1001 and 1002, 20 FCC Rcd. 15750 (Feb 27, 2015) ¶ 2.

[79] *Id.*

[80] *Id.* ¶ 3.

[81] Compl. ¶ 77.

## F.    Expense Sharing and Equity Compensation

Plaintiffs allege that the Entity Defendants, as DTV America's controllers, used their control to "prop up [Innovate's] financial position while also diluting the [minority shareholders of DTV America]."[82]  According to the Complaint, the Entity Defendants caused DTV America to enter into a "Right to Use" agreement (the "Right to Use Agreement").[83]   The Complaint offers no details as to when this agreement was entered or its terms.  The Complaint alleges that this agreement "adds over $12 million in long-term debt payable to [Entity Defendants]."[84]

In addition to the Right to Use agreement, DTV America entered into an "Expense Sharing Agreement" with the Entity Defendants.[85]   The Complaint does not describe the terms of this agreement.   Plaintiffs allege this agreement was mentioned in the 2019 DTV America financial statements.[86]   The Complaint alleges that between 2017 and 2019, DTV America's operating expenses increased from $7.5 million to $12.3 million, and that its total liabilities increased from $12.8

---

[82] *Id.* ¶¶ 62–63.

[83] *Id.* ¶ 65.

[84] *Id.*

[85] *Id.* ¶ 66.

[86] *Id.*

million to $30.2 million.[87]  However, DTV America only recorded an increase of about $100,000 in gross revenues during that time.[88]

Plaintiffs allege that the Conspirators have caused DTV America to "pay[] out large sums of share-based compensation disproportionate to DTV America's profits or revenue."[89]  Plaintiffs allege the Company paid $1,602,879 in share-based compensation in 2019 and $628,000 in 2018, while revenues have remained between $4.7 million and $4.8 million between 2017 and 2019.  There are no other allegations beyond these top-line numbers.  The Complaint does not identify of any recipient of this share-based compensation or allege who approved it.  Nor does the Complaint describe the form of the share-based compensation.

The Complaint alleges that these agreements and compensation arrangements enabled the Entity Defendants to push expenses down to DTV America, damaging DTV America's financial status, and diluting Company's minority stockholders.[90]

### G.    Procedural History

Plaintiffs filed their Verified Complaint on March 15, 2021, and an Amended Verified Complaint (the "Complaint") on June 23, 2021.[91]

---

[87] *Id.* ¶ 67.

[88] *Id.*

[89] *Id.* ¶ 70.

[90] *Id.* ¶¶ 62–72.

[91] Dkt. 1; Dkt. 30.

The Complaint contains seven counts. Count I alleges that Falcone, Sena, Levi, Barr, and Minkov (together, the "Director and Officer Defendants") breached their fiduciary duty of loyalty by expropriating DTV America's assets, value, and opportunities for the benefit of Innovate and its affiliates. Count II alleges that the Entity Defendants, as the controlling stockholders of DTV America, breached their fiduciary duties of loyalty to DTV America's minority stockholders by "steal[ing] numerous business opportunities that rightfully belonged to DTV America."[92] Count III is a direct fiduciary duty claim against the Director and Officer Defendants for their involvement in the "Scheme."[93] Count IV is a derivative breach of fiduciary duty claim and corporate waste claim against the Director and Officer Defendants for permitting the sale of DTV America licenses for inadequate consideration and allowing other DTV America licenses to expire. Count V is a civil conspiracy claim against all Defendants for "engag[ing] in overt acts in furtherance of the conspiratorial Scheme" to loot DTV America.[94] The Complaint alleges all of the Defendants engaged in acts in support of the alleged scheme, "all of which were willful violations of their fiduciary duties."[95] Count VI alleges the Entity Defendants

---

[92] Compl. ¶ 118.

[93] *Id.* ¶ 124.

[94] *Id.* ¶ 133.

[95] *Id.*

aided and abetted the Director and Officer Defendants' breaches of fiduciary duties. Finally, Count VII is asserted solely by the Option Holder Plaintiffs. It alleges that all Defendants tortiously interfered with the Option Holder Plaintiffs' "prospective contractual interests relating to the Options" and "intentionally and improperly interfered with the Option Holders' interests and expectations relating to the Options."[96]

All Defendants have moved to dismiss the Complaint. All Defendants seek dismissal under Court of Chancery Rule 12(b)(6) for failure to state a claim. Continental additionally argues that the Complaint must be dismissed as to it for lack of personal jurisdiction and failure to plead demand futility.[97] Following argument on the motions, the parties filed supplemental submissions in response to questions from the court at and after oral argument.[98] The last submission was filed on July 20, 2022. The court took the matter under submission as of that date.

---

[96] *Id.* ¶¶ 147–48.

[97] Dkt. 35–39. The Innovate Defendants, Sena, Barr, Levi, and Minkov filed one motion to dismiss, which Voigt and Falcone joined. Continental filed its own motion to dismiss and supporting briefs.

[98] Dkt. 55. Despite asserting several derivative claims on behalf of DTV America, Plaintiffs have not named the Company as a nominal defendant in this case. *See* 1 Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.06[e], at 11-176 (2d. ed. 2021) ("The general rule in derivative litigation is that the entity on whose behalf Plaintiff asserts a claim is an indispensable party."). Both parties agree that the Company can later be added as an indispensable party pursuant to Court of Chancery Rule 19(a). *See* Dkt. 60–61. For purposes of deciding the pending motions to dismiss, the court need not join the Company at this time.

## II. ANALYSIS

### A. Plaintiffs Have Not Established Personal Jurisdiction over Continental.

Continental has moved to dismiss the Complaint for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2).[99]  Personal jurisdiction is a threshold issue that must be resolved before considering the merits of the claims. *Reid v. Siniscalchi*, 2018 WL 620475, at *12 (Del. Ch. Jan. 30, 2018).  The court begins its analysis here.

Once a defendant moves to dismiss pursuant to Rule 12(b)(2), the plaintiff bears "the burden to show a basis for the Court's jurisdiction over the nonresident defendant."  *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008).  In deciding a Rule 12(b)(2) motion, "the court may consider the pleadings, affidavits, and any discovery of record."  *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).  Plaintiffs submitted no affidavits to establish jurisdiction over Continental, served no discovery in aid of establishing personal jurisdiction over Continental, and did not argue in their answering brief that discovery was necessary to establish jurisdiction.  Where, as here, "no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction, and the

---

[99] Dkt. 39.

24

record is construed in the light most favorable to the plaintiff." *Id*. (internal quotations omitted).

Continental is a nonresident defendant incorporated in the state of Texas.[100] It is not alleged to have conducted business in or otherwise have a connection with this forum. In response to the motion to dismiss, Plaintiffs assert that jurisdiction over Continental is proper under the conspiracy theory of jurisdiction.[101]

Conspiracy is not an independent basis for personal jurisdiction; it merely provides a rubric whereby the actions of a co-conspirator may "create sufficient minimum contacts with Delaware to satisfy the long-arm statute and due process." *Lacey v. Mota-Velasco*, 2020 WL 5902590, at *6 (Del. Ch. Oct. 6, 2020). To obtain personal jurisdiction over an alleged conspirator who is absent from the forum state, a plaintiff must make a factual showing that:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982). "Delaware courts construe this test narrowly and require a plaintiff to assert

---

[100] Compl. ¶ 9.

[101] *Id.* ¶ 24; Dkt. 44 ("Pls.' Continental Ans. Br.") at 2.

specific facts, not conclusory allegations, as to each element." *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at \*10 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

Continental argues that Plaintiffs fail to allege facts to support any of the five elements of the *Istituto Bancario* test,[102] but focuses its argument on elements two and three. The court agrees that Plaintiffs have failed to make a prima facie showing to support the second and third elements.[103] The Complaint contains no well-pleaded factual allegations that Continental was a member of any conspiracy. Continental, a wholly owned subsidiary of Innovate, owned approximately 8% of DTV America's voting stock. Continental's ownership of DTV America stock is the only specific allegation in the Complaint as to Continental.

There are no allegations that anyone at Continental communicated with anyone at Innovate, its other affiliates, or any of the Individual Defendants concerning any of the acts alleged in the Complaint. The Complaint specifically defines the "Conspirators" as Falcone, Levi, Sena, Minkov, Barr, and Voigt.

---

[102] Dkt. 39 ("Continental's Opening Br.") 8

[103] Additionally, Continental asserts that it should be dismissed from this case because: (i) the claims asserted against it are derivative in nature and Plaintiffs did not plead demand futility; (ii) Plaintiffs failed to state a cognizable claim under Court of Chancery Rule 12(b)(6) by failing to allege any wrongful act by Continental; and (iii) Plaintiffs failed to allege that Continental was part of the Innovate "control group." *Id.* 9–25. Because this court finds that it lacks personal jurisdiction over Continental, this opinion does not address Continental's additional grounds for dismissal.

Continental is not among them. There are no allegations that any of the alleged Conspirators served as an officer or director of Continental or that Continental ever voted its shares of DTV America. In sum, the Complaint is bereft of any well-pleaded facts to establish that Continental participated in any conspiracy.

The Complaint also lacks allegations to support a prima facie showing as to the third element of the conspiracy theory test, *i.e.*, a "substantial act or substantial effect in furtherance of the conspiracy" that occurred in this state. *See Altabef v. Neugarten*, 2021 WL 5919459, at *8 (Del. Ch. Dec. 15, 2021) ("A conspiracy is not an independent jurisdictional hook; there must still be an anchoring Delaware act."); *Lacey*, 2020 WL 5902590, at *7 ("Even assuming that [the defendant] was a part of a conspiracy, in order to establish jurisdiction the Plaintiff would have to allege that a substantial act in furtherance of that conspiracy was taken in Delaware."). Under the *Istituto Bancario* framework, any act by a member of the conspiracy is attributed to all of the members of the conspiracy. *Istituto Bancario*, 449 A.2d at 225; *accord O'Gara v. Coleman*, 2020 WL 752070, at *13 (Del. Ch. Feb. 14, 2020). The Complaint fails to make a prima facie showing that any act or substantial effect of the alleged conspiracy occurred in Delaware.

The conspiracy theory of jurisdiction applies to a "defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state." *Istituto Bancario*, 449 A.2d at 225. There are no allegations that any

27

act or substantial effect of the alleged conspiracy occurred in Delaware, and there is certainly no allegation that Continental knew of any acts or effects having occurred in Delaware. *Cf. Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1028–29 (Del. 2012) (holding that the complaint supported an inference that a non-resident defendant knew that the corporation was a Delaware entity, that a certificate of dissolution had been filed in Delaware, and that co-conspirators intended to continue the business after dissolution).

The Plaintiffs' decision to lump Continental together with the other Innovate Defendants cannot satisfy their pleading obligation to make a prima facie showing of personal jurisdiction over Continental. Delaware respects the corporate separateness of individual entities. *Pauley Petrol. Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968). As Vice Chancellor Glasscock recently decided in *Lacey*, merely invoking a conspiracy theory of jurisdiction among entities in the capital structure of a controlling stockholder is not enough to establish jurisdiction over a non-resident defendant. *Lacey*, 2020 WL 5902590, at *7–8; *see also Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 930 (2011) ("[M]erging parent and subsidiary for jurisdictional purposes requires an inquiry 'comparable to the corporate law question of piercing the corporate veil.'") (quoting Brilmayer & Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency*, 74 Cal. L. Rev. 1, 14, 29–30 (1986)). Plaintiffs have not

28

argued that the court should disregard Continental's status as a separate entity and, instead, treat all of the entity defendants as a unitary business subject to personal jurisdiction in Delaware. They have forfeited any right to do so by not briefing the issue, and the court does not consider it here.

The Complaint does not allege that any substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware—not by Continental or any other defendant. Nor did the Plaintiffs' answering brief identify any acts or effects having occurred in Delaware.[104] Having failed to make a prima facie showing on this element of the conspiracy theory test, Plaintiffs are not entitled to pursue their claims

---

[104] At oral argument, Plaintiffs asserted for the first time a possible "act" subjecting Continental to jurisdiction in this court: "[T]he act here that's alleged is the act of controlling a Delaware corporation, which is DTV [America]." Dkt. 56 ("Hrg. Tr.") 37. This new argument, which was not briefed, is waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *see also Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 642 (Del. Ch. 2011) (ruling that an argument raised for the first time at a hearing was "not fairly or timely presented and was waived"), *aff'd*, 76 A.3d 808 (Del. 2013). Nor did Plaintiffs support this argument with any legal authority. At argument, Plaintiffs cited *Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535 (Del. Ch. 1991), in support of their newly spun basis for jurisdiction. Even if the court were to consider this untimely argument, *Hart Holding* is inapposite. There, the court permitted discovery into the question of jurisdiction over a non-Delaware conspirator where it appeared that the "operative events critical to the success of the alleged conspiracy . . . did involve actions in this state." *Id.* at 542. Those acts were the effectuation of a merger involving a Delaware corporation and perhaps the issuance of shares upon exercise of warrants. *Id.* The Plaintiffs do not allege any such acts here. *See Lacey*, 2020 WL 5902590, at *7–8 (granting a motion to dismiss filed by the non-resident parent of the controlling stockholder where the plaintiff's conspiracy theory of jurisdiction failed to allege any acts in furtherance of the conspiracy having occurred in Delaware).

against Continental. Accordingly, Continental's motion to dismiss for lack of personal jurisdiction is granted.

## B. Claims Accruing Before March 15, 2018 Are Time-Barred.

Defendants have moved to dismiss several of Plaintiffs' claims as untimely under the doctrine of laches. "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after the plaintiff knew of an infringement of his rights, thereby resulting in material prejudice to the defendant." *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996). The party asserting laches has the burden of establishing every element of the defense. *See Hudak v. Procek*, 806 A.2d 140, 154 (Del. 2002) ("[T]he burden to prove the elements of laches—both delay and prejudice to defendants—rests upon the defendants."); *see also* Ct. Ch. R. 8(c) (stating that affirmative defenses such as laches shall be "set forth affirmatively").

Although laches is "not ordinarily well-suited for treatment" at the motion to dismiss stage, the court may dismiss a complaint on grounds of laches if "it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it." *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009); *see Buerger v. Apfel*, 2012 WL 893163, at *4 (Del. Ch. Mar. 15, 2012) (recognizing that laches can be applied at the pleadings stage if "the complaint itself alleges facts

30

that show that the complaint is filed too late") (quoting *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993).

"Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period." *U.S. Cellular*, 677 A.2d at 502; *see also Kraft v. WisdomTree Inv., Inc.*, 145 A.3d 969, 973–83 (Del. Ch. 2016) (providing the applicable framework in this court for determining whether legal and equitable claims are time-barred). The parties do not dispute that the presumptive limitations period for all of the Plaintiffs' claims is three years. *See* 10 *Del. C.* § 8106.[105] The three-year limitations period under Section 8106 begins to run at the time of the wrongful act giving rise to the claim, "even if the plaintiff is ignorant of the cause of action." *S'holder Representative Servs. LLC v. Alexion Pharm., Inc.*, 2021 WL 3925937, at *5 (Del. Ch. Sept. 1, 2021).

Plaintiffs' initial complaint was filed on March 15, 2021.[106] Thus, any claims accruing before March 15, 2018 are time-barred unless the Plaintiffs can establish a

---

[105] *See* Pls.' HC2 Ans. Br. 15 (conceding that "[e]ach of Plaintiffs' claims is subject to an analogous three-year statutory limitations period"); *see also In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013) (applying the statute of limitations by analogy to a breach of fiduciary duty claim); *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011) (applying the statute of limitations by analogy to breach of fiduciary duty and aiding and abetting claims); *BTIG, LLC v. Palantir Techs., Inc.*, 2020 WL 95660, at *3 (Del. Super. Ct. Jan. 3, 2020) (applying the three-year statute of limitations to tortious interference and civil conspiracy claims).

[106] Dkt. 1.

recognized exception that would toll the running of the statute of limitations. *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *11 (Del. Ch. Dec. 20, 2013).

Plaintiffs invoke the doctrine of equitable tolling to avoid the presumptive limitations period. "Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing . . . where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008). Under the equitable tolling doctrine, the limitations period ceases to run only until "the plaintiff is objectively aware of the facts giving rise to the wrong, *i.e.* on inquiry notice." *Id.*

When a plaintiff invokes equitable tolling, it does not enjoy the plaintiff-friendly standard under Court of Chancery Rule 12(b)(6), and the court is not required to draw plaintiff-friendly inferences when determining whether the pleadings support tolling. *Eni Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *11 (Del. Ch. Nov. 27, 2013). Plaintiffs bear the burden of "plead[ing] facts supporting the applicability of that exception." *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524 (Del. Ch. 2005).

> The reason for this [heightened pleading] requirement is plain: having discovered the facts sufficient to bring an action, a [plaintiff] is uniquely aware of the circumstances which caused it to fail to do so in a timely manner; consequently, it bears the burden of pleading with specificity the reasons that the defendant should not enjoy the protections of the statutorily-imposed (or bargained-for) limitations period.

*Eni Holdings,* 2013 WL 6186326, at *11. Therefore, Plaintiffs must offer facts to show when they "learned of the [challenged transaction] . . . ; when [Plaintiffs] had notice of facts concerning possible unfairness of the terms; and the reasonable steps [Plaintiffs] took to oversee [their] investment." *Buerger*, 2012 WL 893163, at *4 (quoting *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993)).

Plaintiffs have not pleaded when they learned of any of the Defendants' wrongful conduct. In their briefing, the Stockholder Plaintiffs merely assert that they "rel[ied] on the supposed good faith and competency of the [Director and Officer Defendants] and . . . therefore justifiably assumed Defendants were not engaging in wrongful self-dealing to the ongoing detriment of DTV America and its minority stockholders."[107] This is not enough to satisfy the Plaintiffs' burden. "Even where a defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available." *In re Dean Witter P'rship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998); *accord Erisman*, 2021 WL 6134034, at *14. The Plaintiffs do not allege or indicate in their answering

---

[107] Pls.' HC2 Ans. Br. 16. At oral argument, Plaintiffs pointed to two paragraphs referencing financial statements as possible markers for inquiry notice: "So the complaint alleges that the plaintiffs learned of the alleged misconduct or wrongful conduct concerning the expense sharing agreement by reviewing financial statements that pertain to that year and they did so. And the statements were for 2018, so they were for calendar year 2018 looking back. So that suggests to me, and I think a reasonable inference can be drawn that those statements were reviewed after 2018, or after at least March 15, 2018, which the defendants say is the witching date." Hrg. Tr. 54:03–14.

brief when they were on notice of any of their claims that accrued outside the three-year limitations period.  Based on the Complaint, it is apparent that Plaintiffs learned of their claims by reviewing publicly available FCC filings.    The Plaintiffs confirmed at oral argument that they obtained information supporting their claims from FCC filings,[108] but they never alleged or otherwise disclosed when the Plaintiffs learned of that information.  Nor have the Plaintiffs alleged any reasonable steps that they took to monitor their investment in the Company.[109]

The unfocused, disjointed allegations of the Complaint lack sufficient information to determine when many claims accrued.  For example:

- The Complaint alleges that over 70 broadcasting station licenses or construction permits were wrongfully transferred from DTV America to unidentified Innovate entities (the "License and Permit Transfers").[110]  The Complaint merely asserts, without elaboration, that the Licenses and

---

[108] Hrg. Tr. 50:15–20.

[109] In this case, many of the Plaintiffs are former DTV America executives.  For example, Kyle, Bocock, Dagen, and DeStefanis were all directors of DTV America as of October 14, 2016.  DTV America Corp., Notice of Exempt Offering of Securities (Form D) (Oct. 14, 2016) (signed by Kyle as "Chief Executive Officer" of DTV America).  The court can take judicial notice of these facts which are not subject to reasonable dispute. *See Hughes*, 897 A.2d at 170 ("This Court has recognized that, in acting on a Rule 12(b)(6) motion to dismiss, trial courts may consider hearsay in SEC filings to ascertain facts appropriate for judicial notice under [Delaware Rule of Evidence] 201." (internal quotations omitted)).

[110] Compl. ¶¶ 43–44.

Permit Transfers have occurred "*since 2017.*"[111] The Complaint merely lists approximately 28 of these licenses by call letters and city and state of location. Otherwise, there are no facts as to when the transfers occurred.

- The Complaint alleges that Innovate subsidiaries acquired "more than 100 LPTV stations" that were previously identified for acquisition by DTV America."[112] The Complaint states that these acquisitions took place "*between June 2017 and December 2020.*"[113]

- The Complaint alleges that "*[s]ince 2017*, over 115 of DTV America's licenses and construction permits have expired and [become] worthless."[114] That is the entire sum and substance of this allegation.

- The Complaint's Repacking allegations assert that Innovate entities arrogated DTV America's "best open and available channels" at some time "*[a]fter . . . November 2017.*"[115] There are no other allegations as to when this occurred.

- Plaintiffs assert that the Innovate Defendants are exploiting DTV America financially through a Right to Use Agreement, Expense Sharing

---

[111] *Id.* ¶ 44 (emphasis added).

[112] *Id.* ¶ 34.

[113] *Id.* (emphasis added).

[114] *Id.* ¶ 81 (emphasis added).

[115] *Id.* ¶ 77 (emphasis added).

Agreement, and Innovate's position as a large minority investor.[116] No specific dates are provided for this alleged exploitation. Plaintiffs rely, however, upon the financial statements for the years 2018 and 2019.[117] There are no allegations as to when the Right to Use agreement was entered. The Complaint alleges that the Expense Sharing Agreement was entered in 2018.[118]

The court is not able to determine, at this stage, when each of the claims accrued, but many are alleged to have accrued more than three years before the filing of the Complaint. As to any claims concerning pre-March 15, 2018 conduct, the Plaintiffs' claims are time-barred and dismissed, except as discussed below.

As to certain claims, the Complaint provides sufficient facts to establish the accrual date. For example, Plaintiffs allege that Innovate "acquired Azteca America for themselves" in "November 2017."[119] Plaintiffs allege that the "HC2 Entities usurped the opportunity" and "DTV America was in the best position to take advantage of the Azteca America opportunity."[120] The crucial event within this allegation is the wrongful acquisition of Azteca America, which occurred in

---

[116] *Id.* ¶¶ 62–72.

[117] *Id.* ¶¶ 66, 67, 70, 71.

[118] *Id.* ¶ 71.

[119] *Id.* ¶ 40.

[120] *Id.* ¶ 42.

November 2017. This date is four months outside the analogous statute of limitations for Plaintiffs' claims.

Dismissal of this claim is appropriate because "it is clear from the face of the complaint that the claims are time-barred." *Akrout v. Jarkoy*, 2018 WL 3361401, at *11 (Del. Ch. July 10, 2018) (citation omitted). Plaintiffs have not pleaded any fact supporting equitable tolling as to this claim. Dismissal is therefore appropriate. *See, e.g., Chertok v. Zillow, Inc.*, 2021 WL 4851816, at *7 (Del. Ch. Oct. 18, 2021) (granting motion to dismiss complaint as time-barred), *aff'd,* 2022 WL 1789337 (Del. June 1, 2022); *Pettinaro*, 870 A.2d at 533–34 (same).

Plaintiffs' claims as to DTV Cast are also time-barred. The Complaint alleges that the Entity Defendants, "under the direction of the Conspirators, rebranded DTV Cast as 'Central Cast' and appropriated it for HC2 Broadcasting."[121] The Complaint does not specify when this appropriation occurred. Nevertheless, the Complaint acknowledges that it happened more than three years before Plaintiffs filed their original Complaint. This conclusion is drawn from the Complaint's allegation that the misappropriation of DTV Cast "*made it possible* for the [Innovate Defendants] to go on a $150,000,000 acquisition spree to purchase stations, *starting in November 2017*."[122] Therefore, the misappropriation of DTV Cast must have occurred prior to

---

[121] *Id.* ¶ 74.

[122] *Id.* ¶ 75 (emphasis added).

that date, which is outside the analogous three-year limitations period. Accordingly, all of Plaintiffs' claims arising from the DTV Cast misappropriation are time-barred and must be dismissed.[123]

The motion to dismiss the claim alleging usurpation of a corporate opportunity to acquire stations from Frank Digital Broadcasting is denied. The Complaint alleges that DTV America negotiated a deal to acquire those stations in October 2017 and that on April 15, 2018, the HC2 Station Group filed an application with the FCC to purchase those licenses. Although the April 15, 2018 application is within the three-year limitations period, the Innovate Defendants argue that this claim is, nevertheless, time-barred. The Innovate Defendants contend this claim accrued on March 12, 2018. To support that argument, the Innovate Defendants have submitted a copy of the asset purchase agreement between HC2 Station Group and Frank Digital Broadcasting, which indicates that it is "entered into as of" March 12, 2018.[124] The agreement is dated "as of" three years and three days prior to the filing of the original Complaint.

Under the doctrine of equitable tolling, the statute of limitations is tolled only until the plaintiff discovers or, exercising reasonable diligence, should have

---

[123] Plaintiffs' claims based on the following events are not time-barred: (i) the November 11, 2019 Lowcountry Sales; (ii) the March 12, 2021 Gray Media Sale; and (iii) the March 17, 2021 TV-49 Sale.

[124] HC2 Defs.' Opening Br. Ex. E.

discovered her injury. *Dean Witter*, 1998 WL 442456, at *6. Even considering the asset purchase agreement as integral to the Complaint, the document does not show when it was actually executed. There is also no indication or explanation that it was available to the Plaintiffs before March 15, 2018 so as to put them on inquiry notice of their claim. *Id.*[125] Given the close proximity of the date of the contract to the outside date of the statute of limitations period, the court cannot conclude at this stage that the Plaintiffs were on inquiry notice of this claim before March 15, 2018. Accordingly, the motion to dismiss the corporate opportunity claim concerning the Frank Digital Broadcasting transaction on grounds of laches is denied.

The usurpation of DTV America's opportunity to acquire the WFWC-CD Station Group stands on a different footing. DTV America signed a letter of intent to acquire the WFWC-CD Station Group on October 19, 2017. The Plaintiffs allege that on February 8, 2018, Innovate affiliate HC2 Station Group filed an assignment with the FCC for the WFWC-CD Station Group, and on April 6, 2018, the FCC approved the sale of WFWC-CD Station Group to HC2 Station Group.[126] Plaintiffs do not allege, as they must when asserting equitable tolling, when they were on inquiry notice of this claim. *Dean Witter*, 1998 WL 442456, at *6. The basis of this

---

[125] The HC2 Defendants argue that this agreement was disclosed in public filings with the FCC, but they do not state when it was filed and they have not attached the FCC filing with their brief. HC2 Defs.' Opening Br. 11.

[126] Compl. ¶¶ 35–37.

claim—the February 8, 2018 assignment to HC2 Station Group—was publicly filed with the FCC. Plaintiffs also acknowledged that they "were able to inform ourselves of a possible claim . . . by virtue of searching the FCC filings." Hr'g Tr. 50.

The February 8, 2018 publicly filed notice of assignment was a red flag that WFWC-CD Station Group was not being acquired by DTV America, but rather HC2 Station Group, an Innovate affiliate. Even if Plaintiffs did not know that HC2 Station Group was not controlled by Innovate (then HC2 Holdings, Inc.), the FCC filing put them on reasonable notice that DTV America's letter of intent to acquire the WFWC-CD Station Group was not heading toward closing. A reasonably prudent stockholder of DTV America in Plaintiffs' position would have known enough at that point to put them on notice of the need to undertake further inquiry. *See U.S. Cellular*, 677 A.2d at 504 (holding plaintiff had notice of claims based on public filings with the FCC). The information necessary to put the Plaintiffs on inquiry notice was contained in one document. This is not a situation like *Weiss*, where the stockholder would have needed to cull through several public filings "then conduct a statistical analysis in order to uncover the alleged malfeasance." 948 A.2d at 452; *see also Carsonaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 646 (Del. Ch. 2013) (rejecting argument that documents filed with the Delaware Secretary of State, which the plaintiffs would have been required to purchase, established inquiry notice and, even then, the content of the filings was insufficient to put plaintiffs on inquiry

40

notice). Accordingly, Plaintiffs' corporate opportunity claim regarding the WFWC-CD Station Group is time barred.

## C. Failure to State a Claim

All Defendants have moved to dismiss under Court of Chancery Rule 12(b)(6). In addressing a motion to dismiss on this basis:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotations omitted). Although these pleading standards are minimal, *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011), they have reasonable limits. "[A] trial court is required to accept only those reasonable inferences that logically flow from the face of the complaint and is not required to accept every strained interpretation of the allegations proposed by the plaintiff." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citation omitted). Indeed, "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *accord H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 n.9 (Del. Ch. 2003).

41

When it comes to fiduciary duty claims: "A plaintiff must adequately plead a breach of fiduciary duty claim against each individual director or officer; so-called 'group pleading' will not suffice." *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *23 (Del. Ch. Aug. 31, 2020) (internal quotations omitted); *accord Raj & Sonal Abhyanker Fam. Tr. ex rel. UpCounsel, Inc. v. Blake*, 2021 WL 2477025, at *4 (Del. Ch. June 17, 2021); *see In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015) ("[E]ach director has a right to be considered individually when the directors face claims for damages in a suit challenging board action.").

## D.    The Fiduciary Duty Claims

The Stockholder Plaintiffs have packaged their fiduciary duty claims in multiple counts of the Complaint.  Many of the counts overlap.  Counts I, III and IV are asserted against the Director and Officer Defendants.  Count I is a framed as a derivative claim for transferring DTV America assets to the Innovate Defendants and their affiliates, failing to pursue business opportunities that were then passed on to the Innovate Defendants, and selling assets for inadequate consideration to the detriment of the Company and for the benefit of the Innovate Defendants.  Count III is asserted as a direct claim on behalf of the minority stockholders against the Director and Officer Defendants, and simply incorporates earlier paragraphs of the Complaint.  Count IV is a claim against the Director and Officer Defendants for

42

waste of corporate assets[127]—specifically for selling licenses for "next to nothing" and allowing over 70 broadcast licenses and construction permits to expire or "be sold at fire sale prices."[128]

Count II alleges the Entity Defendants breached their fiduciary duties as DTV America's controlling stockholder. This Count is fashioned as a direct claim by the minority stockholders seeking "direct relief in the form of a damages award," for the Innovate Defendants' breaches of the fiduciary duty of loyalty and usurpation of corporate opportunities.[129]

### 1. All of the Fiduciary Duty Claims are Derivative

The Stockholder Plaintiffs have styled many of their fiduciary duty claims as both direct and derivative. In reviewing claims alleging breach of fiduciary duty, the court is not obliged to accept the Plaintiffs' characterization of the claims. "The manner in which a plaintiff labels its claim and the form of words used in the

---

[127] "The waste test is just another way to examine whether a fiduciary breach has been committed." *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *35 (Del. Ch. July 12, 2010); *Sample v. Morgan*, 914 A.2d 647, 699-70 (Del. Ch. 2007) ("Claims of waste are sometimes misunderstood as being founded on something other than a breach of fiduciary duty. Conceived more realistically, the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule.") (citations omitted); *see also In re Barnes & Noble S'holders Deriv. Litig.*, C.A. No. 4813-VCS, at 131 (Del. Ch. Oct. 21, 2010) (TRANSCRIPT) ("Waste is a form of breach of fiduciary duty.").

[128] Compl. ¶¶ 127, 129.

[129] *Id.* ¶ 121.

complaint are not dispositive; rather, the court must look to the nature of the wrong alleged, taking into account all of the facts alleged in the complaint, and determine for itself whether a direct claim exists." *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012). That determination, as our Supreme Court recently reaffirmed, is to be derived from a "simple test of straightforward application to distinguish direct claims from derivative claims." *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021). This test "'turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'" *Id.* (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).

A claim is considered "derivative in nature," under the first element of the *Tooley* test, "[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders." *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008). Plaintiffs' "Scheme" allegations, which have not been consistently pleaded, focus primarily on the alleged "looting [of] DTV America's assets" and "forc[ing] DTV

44

America into unfavorable agreements that negatively impact DTV America's financial position."[130] This harm is derivative.

> Mismanagement which depresses the value of stock is a wrong to the corporation, i.e., the stockholders collectively, to be enforced by a derivative action. . . . A claim that excessive fees, options and bonuses operated to depress the value of the stock of the corporation resulting in a loss in value of the stockholders is merely a claim for the waste of corporate assets—a purely stockholder derivative claim.

*In re First Interstate Bancorp Consol. S'holder Litig.*, 729 A.2d 851, 862 (Del. Ch. 1998) (internal citations and quotations omitted), *aff'd*, 546 A.2d 348 (Del. 1988); *see also Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1188 n.10 (Del. 1988) ("Generally speaking, a wrong to the incorporated group as a whole that depletes or destroys corporate assets and reduces the value of the corporation's stock gives rise to a derivative action."). Here, the "alleged harm is one to the corporation (a diminution of the pool of available assets), and any recovery would flow to the corporation." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 4782349, at *14 (Del. Ch. Sept. 1, 2006).

As alleged here, a claim that "a controller transferred to himself assets of the corporation for less than fair value is a claim belonging to the corporation." *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2017 WL 5565264, at *3 (Del. Ch. Nov. 20, 2017). Similarly, claims alleging usurpation of corporate opportunities

---

[130] *Id.* ¶ 1.

45

and waste are derivative. *In re Digex Inc. S'holders Litig.,* 789 A.2d 1176, 1189 (Del. Ch. 2000) ("A claim that a director or officer improperly usurped a corporate opportunity belonging to the corporation is a derivative claim."); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 771 ("[C]laims of waste are classically derivative"). Accordingly, all of the claims asserted in Counts I–IV are exclusively derivative. Plaintiffs offered no argument to the contrary in their answering brief.

## 2. Sorting Out the Claims

Plaintiffs' disjointed and unwieldy Complaint presented challenges for the Defendants, and even more so for the court. The court will address the claims as the court understands them to be.

To establish a claim for breach of fiduciary duty, a plaintiff must allege: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020). Directors and officers of a Delaware corporation owe "identical" fiduciary duties of loyalty and care to the corporation and its stockholders. *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009).

Similarly, controlling stockholders owe fiduciary duties to the corporation and its stockholders. *Brookfield*, 261 A.3d at 1274; *see also Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018) ("A controlling stockholder owes fiduciary duties to the corporation and its minority stockholders, and it is

'prohibited from exercising corporate power (either formally as directors or officers or informally through control over officers and directors) so as to advantage [itself] while disadvantaging the corporation.'") (citation and emphasis omitted).

In this case, the Plaintiffs allege that the Innovate Defendants became controlling stockholders in November 2017, after they acquired more than a majority of the voting power of the Company's outstanding stock.[131]

Whether and when fiduciary duties attached as to each of the Individual Defendants is difficult to determine, because the Complaint lacks well-pleaded allegations as to when many of the Individual Defendants became officers and directors, when they departed those positions, and when most of the conduct that is alleged to constitute fiduciary duty breaches occurred. It is clear from the Complaint, however, that none of the Individual Defendants served as directors or officers of DTV America until October 2017.

### 3. Usurpation of Corporate Opportunities.

A corporate opportunity claim is a claim for breach of fiduciary duty. *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996) ("The doctrine of corporate opportunity represents but one species of the broad fiduciary duties assumed by a corporate director or officer."). The corporate opportunity doctrine holds that a

---

[131] *Id.* ¶ 16.

fiduciary "may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation." *Id*. at 155. No one factor is dispositive, and all of them must be taken into account insofar as they are applicable. *Id*.

Nearly all of the corporate opportunity claims fail. First, as explained above, claims as to any corporate opportunities usurped before March 15, 2018 are time-barred. Second, the Complaint's vague and generalized allegations of unspecified opportunities having been usurped at unspecified times must be dismissed. The court is not required to accept vague and conclusory allegations that are not supported by well-pleaded facts. *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We do not, however, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor."). Thus, the general allegation that "[b]etween June 2017 and December 2020, more than 100 LPTV stations that were identified by DTV America (prior to November 2017) as its acquisition candidates were purchased by HC2 Holdings

48

through subsidiaries other than DTV America"[132] is insufficient to state a claim.

Plaintiffs fare no better with their allegation that the Director and Officer Defendants "prompted [Innovate] (through its wholly owned subsidiaries) to purchase a number of LPTV broadcast stations that were identified in DTV America's business plan."[133] The Complaint does not name any of the stations purportedly identified in the Business Plan. After the Defendants exposed that shortcoming, the Plaintiffs attached the so-called Business Plan to their answering brief. The Business Plan, which is actually titled "Investor Update," lists a two-column table of 13 acquisition opportunities, identified only as "Target" A through M and an approximate cash cost to acquire each target.[134] But the Business Plan does not identify a single acquisition target by name, and neither the Complaint nor Plaintiffs' brief connects any specific opportunity to any of the unnamed targets listed in the Business Plan.[135] These generalized allegations lack sufficient factual support to establish a prima facie claim for usurpation of corporate opportunities. In short, the Complaint does not identify any opportunity in the Business Plan that the Innovate Defendants took for their

---

[132] Compl. ¶ 34.

[133] *Id.* ¶ 33.

[134] Pls.' HC2 Ans. Br. Ex. A at 29.

[135] The Plaintiffs easily could have done so, as they acknowledge that Plaintiff Kyle prepared the Business Plan. Pls.' HC2 Ans. Br. 3. In addition, the Business Plan itself identifies Plaintiffs Kyle, Bruni, and Podhajser as members of DTV America's management team. *Id*. Ex. A at 19.

own. Therefore, it is not possible to apply the other *Broz* factors. Accordingly, the Plaintiffs have failed to state a claim for usurpation of unknown and unidentified targets in the Business Plan.

Except for one claim discussed below, there are no well-pleaded allegations that any of the Director and Officer Defendants took any act to usurp any alleged corporate opportunity from DTV America. To be sure, the Complaint does not contain any allegations of any board meetings, written consents, communications by or to any of these defendants about any of the events or transactions underlying the Plaintiffs' claims.

Instead, the Complaint lumps each Individual Defendant into the categories of Director and Officer Defendants and Conspirators, and then in conclusory fashion attributes all of the events about which Plaintiffs complain to all of the Individual Defendants. *See, e.g.,* Compl. ¶ 34 ("All the members of the board of directors of DTV America were also members of the Conspirators."); *id*. ¶ 105 ("While directors and officers, the D&O Defendants used their authority to transfer valuable assets from DTV America to the HC2 Entities and their affiliates, including but not limited to state of the art intellectual property, the lucratively 'repackaged' broadcasting channels, the LPTV licenses, and the network programming relationships."); *id*. ¶ 106 ("[T]he D&O Defendants and HC2 Entities sold DTV America licenses for the

direct and indirect financial benefit of HC2 Entities which HC2 Entities are currently in the process of covering up.").

"The blunt nature of the pleading" and Plaintiffs' failure to identify any act by a specific Individual Defendant constituting a fiduciary breach requires dismissal of the claims against them. *See Genworth Fin., Inc. Consol. Deriv. Litig.*, 2021 WL 4452338, at *22 (Del. Ch. Sept. 29, 2021) (dismissing claims asserted against officers where they merely lumped together as "Executive Defendants" and no specific allegations were directed against them).

The Complaint does, however, contain well-pleaded allegations as to one corporate opportunity alleged to have been usurped. In October 2018, DTV America negotiated a deal to purchase Frank Digital Broadcasting's LPTV stations for $65,000. On April 15, 2018, HC2 Station Group filed an application to purchase these stations for itself for the same $65,000 purchase price.[136]

The Defendants do not meaningfully challenge the substance of this corporate opportunity claim.[137] The Complaint alleges well-pleaded facts that DTV America had reached a deal to acquire Frank Digital Broadcasting's LPTV stations. Months after reaching this agreement, Innovate, through its affiliates, acquired those same

---

[136] *Id.* ¶ 39.

[137] The Defendants argued that the claims as to these two transactions are time-barred. As discussed above, the court has denied the motion to dismiss on grounds of laches.

assets. From these well-pleaded allegations, it is reasonably conceivable that this opportunity was within DTV America's line of business, and that the Company had an expectancy in and was financially capable of exploiting the opportunity. It is also reasonably conceivable that the Innovate Defendants took this opportunity for themselves, placing them in a position inimicable to their duties to DTV America.

Analyzing this claim as to the Director and Officer Defendants is much more challenging. The Complaint does not identify the composition of the DTV America board at the time of the transaction. Nor does it allege that any board action occurred. Based on the Complaint, Falcone, Minkov, and Levi served as officers and/or directors of DTV America at the time of this transaction. Falcone was the Chief Executive Officer, President, and Chairman of the Board of both Innovate and DTV America when Innovate's affiliate executed the asset purchase agreement for the Frank Digital Broadcasting properties. Levi was also a conflicted officer, having served at that time both as Chief Operating Officer of HC2 Station Group, the Innovate affiliate that acquired the properties, while also serving as director and Chief Operating Officer of DTV America. Levi also signed the Frank Digital Broadcasting asset purchase agreement in his capacity as COO of HC2 Station Group. Minkov began as DTV America's CFO at some time in April 2018, but it is not apparent when he became a director. At the time of the Frank Digital Broadcasting transaction, he was an officer and director of HC2 Broadcasting. None

52

of the other Individual Defendants are alleged to have served as officers or directors of DTV America at the time of the transaction.

The court is left with the tension between the plaintiff-friendly standard of Rule 12(b)(6) and the requirement that a "plaintiff must adequately plead a breach of fiduciary duty claim against each individual director or officer; so-called 'group pleading' will not suffice." *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *23; *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *43 (Del. Ch. June 11, 2020) (dismissing director defendant where the complaint did not identify specific, non-conclusory facts to support an inference that she acted disloyally); *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 896 (Del. Ch. 2020) (finding that the court must identify individual conduct on the part of each director in which they furthered the self-interest of an interested party to support a claim for breach of loyalty), *aff'd*, 262 A.3d 1034 (Del. 2021).

Here, the Complaint does not allege any board action whatsoever. Giving the Plaintiffs the benefit of all reasonable inferences, it is reasonably conceivable that Levi breached his fiduciary duties to DTV America as a conflicted fiduciary who executed the Frank Digital Broadcasting asset purchase agreement. The allegations are not so strong as to Falcone, but given his dual-fiduciary capacities as CEO, President, and Chairman at both Innovate and DTV America at the time, it is reasonably conceivable that he approved and authorized this transaction.

Defendants' briefs hardly address these transactions in their motions to dismiss. In light of Falcone and Levi's roles at the time of Frank Digital Broadcasting sale, it is reasonably conceivable that each approved and authorized the transaction.

Therefore, the Complaint adequately alleges that Falcone and Levi breached their fiduciary duties in connection with the Innovate Entities' usurpation of DTV America's opportunity to acquire LPTV stations from Frank Digital Broadcasting.

### 4. Duty of Loyalty.

#### a. Gray Media Sale.

In March 2021, DTV America and HC2 Broadcasting entered into an asset purchase agreement with Gray Media, transferring ten licenses to Gray Media.[138] As controlling stockholders of DTV America at the time of the transaction, the Innovate Entities owed DTV America fiduciary duties of loyalty and care. "To plead a claim for breach of the duty of loyalty that will overcome a motion to dismiss, a plaintiff must plead sufficient facts to support a rational inference that the corporate fiduciary acted out of material self-interest that diverged from the interests of the shareholders." *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *21 (Del. Ch. Mar. 31, 2017).

---

[138] *Id.* ¶¶ 53–58.

The Complaint alleges that six of the licenses in the Gray Media Sale belonged to DTV America[139] and the other four "were previously improperly transferred from DTV America to [the Entity Defendants'] control for no consideration."[140] The Complaint alleges that the $475,000 purchase price for the ten licenses was not allocated among the licenses.[141] Plaintiffs allege that all proceeds from the Gray Media Sale went to the Entity Defendants and that DTV America received no consideration for its licenses.[142] After this litigation was filed, HC2 Broadcasting sent a letter to the FCC citing a "technical issue" and claiming that four of the transferred licenses had been incorrectly listed as belonging to HC2 Broadcasting instead of DTV America.[143] In other words, HC2 Broadcasting owned none of the licenses listed in the Gray Media Sale agreement.

It is reasonably conceivable the Innovate Defendants breached their duty of loyalty by causing DTV America to transfer its licenses to a third-party and taking the full purchase price for themselves. Defendant contests the Complaint's assertion that "the proceeds of the sale went directly to the [Innovate] Entities, and DTV

---

[139] *Id.* ¶ 53. The Complaint identifies these licenses by city, state, and call letters. *Id.* ¶ 53 n.1.

[140] *Id.*

[141] *Id.* ¶ 54

[142] *Id.* ¶ 55.

[143] *Id.* ¶ 56.

America received no consideration for its licenses," arguing the statement is conclusory and unsupported.[144] The Complaint alleges that both DTV America and HC2 Broadcasting were listed as "Seller" under the agreement and the purchase price was to be transferred in accordance with wire instructions "sent by the Seller."[145] The well-pleaded facts support a reasonable inference that HC2 Broadcasting received consideration for the sale of the ten broadcast licenses held by DTV America to the exclusion of DTV America. As such, the court declines to dismiss the Gray Media Sale claims against the Innovate Defendants.

This claim is not well-pleaded as to the Director and Officer Defendants and must be dismissed. The Complaint identifies no individual or board-level action involving the Gray Media Sale. The Complaint does not mention the Conspirators or alleged Conspiracy at all in connection with the Gray Media Sale. Because the Complaint does not identify any individual's involvement in the Gray Media Sale, this claim must be dismissed as to the Director and Officer Defendants.

### b. TV-49 Sale.

HC2 Broadcasting Holdings sold six licenses to TV-49 for $145,333 on March 17, 2021. Plaintiffs allege that DTV America owned and was named licensee

---

[144] *Id.* ¶ 55; *see* HC2 Defs.' Opening Br. 39.

[145] Compl. ¶¶ 53–54.

of four licenses sold in the transaction.[146]  The Complaint identifies each by location, call sign, and FCC facility number.[147]  The Complaint further alleges that "[t]he Conspirators and HC2 Entities improperly transferred control of these licenses to HC2 Broadcasting."[148]  Levi signed this asset purchase agreement in his capacity as Chief Operating Officer of HC2 Broadcasting.[149]  DTV America is not mentioned in the purchase agreement.[150]

Taking these allegations as true, it is reasonably conceivable that the Innovate Entities breached their duty of loyalty by causing DTV America to transfer its licenses to an Innovate Entity, which then sold the licenses to TV-49 without compensating DTV America.  Further, the Plaintiffs have adequately alleged a breach of fiduciary duties by Levi, who signed the purchase agreement.  The Complaint does not contain any allegations pertaining to the other Individual Defendants as to the transaction.  Therefore, the TV-49 Sale claim is sustained as to Levi and the Innovate Entities but is dismissed as to the other Defendants.

---

[146] *Id.* ¶ 59.

[147] *Id.* ¶ 59 n.2.

[148] *Id.* ¶ 60.

[149] *Id.* ¶ 61.

[150] *Id.*

### c. Expense Sharing Agreement, Right to Use Agreement, and Stock-Based Compensation Claims.

Plaintiffs' claims concerning the Expense Sharing Agreement, Right to Use Agreement, and unidentified agreements regarding stock-based compensation are dismissed for two independent reasons. First, the Complaint's allegations of as to these agreements fail to state a claim upon which relief can be granted. The Complaint does not describe any of the terms of the agreements and does not attach them to the Complaint or their brief. The Plaintiffs' failure to provide the terms of these agreements renders the parties and the Court unable to assess whether the terms of those agreements were fair to DTV America, when they were entered, or which of the defendants were involved in proposing or approving any of those agreements.

For example, Plaintiffs merely allege that DTV America's expenses and liabilities increased after DTV America purportedly entered into those agreements. But the mere fact that the Company's expenses increased after it entered into the agreements without an understanding of their terms is insufficient to demonstrate any type of causal relationship.

In short, the allegations as to these three agreements lack sufficient well-pleaded facts to support claims for breach of fiduciary duty. *See Criden v. Steinberg*, 2000 WL 354390, at *3 (Del. Ch. Mar. 23, 2000) (dismissing claims where the complaint failed to specifically allege why an agreement breached the duty of loyalty); *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.

58

2006) ("A trial court is not . . . required to accept as true conclusory allegations 'without specific supporting factual allegations.'") (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

These claims also fail because the Plaintiffs' Answering Brief did not respond to arguments the Innovate Defendants raised in their opening brief regarding these agreements. Instead, the fact section of the Plaintiffs' answering brief repeats some of the allegations contained in the Complaint,[151] but contains no argument in support of these claims. Nor did Plaintiffs address these claims at oral argument. Therefore, the Plaintiffs have waived any argument to support their claims as to these agreements. "A party's failure to raise an argument in its answering brief constitutes a waiver of that argument." *King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 360 (Del. Ch. 2010), *rev'd on other grounds*, 12 A.3d 1140 (Del. 2011); *see Emerald P'rs v. Berlin,* 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived." (citing *Murphy v. State,* 632 A.2d 1150, 1152 (Del. 1993) and *Loudon v. Archer– Daniels–Midland Co.,* 700 A.2d 135, 140 n.3 (Del. 1997))); *T.A.H. First, Inc. v. Wescott*, 2004 WL 2827879, at *2 (Del. Super. Ct. Nov. 23, 2004) ("Employer mentions the accident in the 'Statement of Facts' section of the opening brief but does not argue the import of the accident in the 'Argument' section. This Court

---

[151] *See* Pls.' HC2 Ans. Br. 65–67, 71–72.

59

therefore finds that this argument has been waived."); *In re Mobilactive Media, LLC*, 2013 WL 297950, at *12 n.152 (Del. Ch. Jan. 25, 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived . . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (omissions in original) (quoting *Roca v. E.I. duPont de Nemours & Co., Inc.*, 842 A.2d 1238, 1243 n.12 (Del. 2004))); *accord AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *78 (Del. Ch. Nov. 30, 2020) ("A court need not address arguments that are presented in such a cursory and elliptical manner."), *aff'd*, 268 A.3d 198 (Del. 2021). Plaintiffs have failed to satisfy that obligation in regard to these agreements. Accordingly, Plaintiffs' claims challenging the Expense Sharing Agreement, Right to Use Agreement, and stock-based compensation are dismissed.[152]

---

[152] Plaintiffs also did not respond to the Innovate Defendants' arguments in support of the motion to dismiss claims concerning FCC Repacking. *See* HC2 Defs.' Opening Br. 41. Those claims are dismissed, as well.

### 5. Count IV States a Claim for Corporate Waste

Count IV asserts a claim of corporate waste against the Director and Officer Defendants. Although the Complaint included several acts of corporate waste, the Plaintiffs focused on only one: the Lowcountry Sales.[153]

For a claim of waste to survive a motion to dismiss, a plaintiff must show "economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007). A "claim of waste will arise only in the rare, 'unconscionable cases where directors irrationally squander or give away corporate assets.'" *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)). This high pleading standard is crucial, as "[a]ny other rule would deter corporate boards from the optimal rational acceptance of risk . . . . Courts are ill-fitted to attempt to weigh the

---

[153] Compl. ¶¶ 47–48. The Complaint asserts three primary bases for the waste claim: (i) the sale of DTV America licenses for inadequate value; (ii) the transfer of DTV America's licenses to Innovate Entities for inadequate value; and (iii) the expiration of DTV America licenses and construction permits. Defendants argue that "[m]erely alleging that the defendants elected not to renew unidentified licenses at unidentified times is insufficient to state a waste claim." Plaintiffs did not respond to this argument, as their briefing on the waste claim was limited to the Lowcountry Sales. Therefore, Plaintiffs waived their argument as to any other basis for their waste claim by failing to address it in their briefing and oral argument. *See Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived."); *Richard B. Gamberg 2007 Family Tr. v. United Rest. Gp., L.P.*, 2018 WL 566417, at *4 (Del. Ch. Jan. 26, 2018) ("Plaintiff chose very specific arguments on which to stand. I address only these arguments . . . .").

'adequacy' of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk." *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).

In November 2019 two DTV America Stations were sold to Lowcountry for nominal consideration paid to DTV America and "additional consideration" provided to Innovate. The Complaint alleges that this "additional consideration" was the extension of time to finalize a sale of Lowcountry assets to an HC2 Entity.[154] Within a year of these sales, Lowcountry sold one of the licenses for $200,000 and sold the other, along with two additional licenses, for over $350,000.[155]

Plaintiffs analogize this claim with the waste claim that was sustained in *Orloff v. Shulman*, 2005 WL 3272355, at *3–6 (Del. Ch. Nov. 23, 2005). In *Orloff*, the plaintiffs alleged the defendants wasted corporate assets by approving rents for the company's properties for less than 20% of their market value, as measured

---

[154] Compl. ¶¶ 47–48. The Innovate Defendants argue that the additional consideration was provided to DTV America, basing their argument solely on the terms of the contract itself, which reads:

> ADDITIONAL CONSIDERATION FOR THE TRANSACTION IS THE EXTENSION OF TIME GRA[N]TED BY LOW COUNTRY 34 MEDIA, LCC TO DTV AMERICA CORPORATION IN A RELATED TRANSACTION BETWEEN THE PARTIES (SEE FCC FILE NO. BALCT – 20190520AAU).

*Id.* ¶ 48. The FCC file describes an asset assignment between Lowcountry and HC2 Station Group. Pls.' HC2 Ans. Br. Ex. C. DTV America is not mentioned in the filing. *Id.*

[155] Compl. ¶¶ 50–51.

against rents charged for properties on the same street. *Id.* at *13. Plaintiffs argue the same dramatic disparity is alleged here, warranting discovery.

Defendants argue that *Orloff* is inapposite and that the Complaint obscures important context. Defendants point out that: (i) Lowcountry had over six months to develop W26DT-D and increase its market value; and (ii) WCFZ-LD was sold as a package with two other licenses, whose values are not identified in the Complaint.[156] Therefore, Defendants assert, the particularized allegations fail to meet the high standard required to plead a claim for waste of corporate assets

Defendant's explanation may ultimately pan out, but the allegations of the Complaint also support a reasonable inference that these licenses were sold without any benefit to DTV America. Any "additional consideration" outside of the $2 payment for this transfer flowed to non-party HC2 Holding Group. A payment of a single dollar for a station license that was later turned around and sold six months later for $200,000 is striking. "[T]he size of the gap between the two numbers means that the court cannot say that a claim of waste . . . could not be proven at trial." *Orloff*, 2005 WL 3272355, at *13.

Like the corporate opportunity claim relating to Frank Digital Broadcasting, the Complaint alleges only that Falcone and Levi served on the DTV America board

---

[156] HC2 Defs.' Opening Br. 47.

at the time of the Lowcountry sale. Levi signed the Lowcountry Asset Purchase Agreement as "Managing Director" of DTV America.[157] There are no other allegations that any other of the Individual Defendants served as a director of DTV America at the time of this sale or had any specific involvement in approving or effectuating the transaction. Accordingly, the Complaint states a claim for waste of corporate assets against Levi and Falcone. This claim is dismissed as to the remaining Individual Defendants.

### 6. Aiding and Abetting Breaches of Fiduciary Duty

In Count VI, the Stockholder Plaintiffs allege the Innovate Defendants aided and abetted the Director and Officer Defendants' breaches of fiduciary duty. The Stockholder Plaintiffs allege the Innovate Defendants participated in the "Scheme" of diverting business opportunities that belonged to DTV America and inundating DTV America with debt and expenses through agreements such as the Expense Sharing Agreement[158]

To plead a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead: "'(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach,

---

[157] Pls.' HC2 Ans. Br. Ex. B.

[158] Compl. ¶¶ 138–41.

and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary duty.'" *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)). A claim of aiding and abetting will fail if the court fails to find an underlying breach of fiduciary duty. *See, e.g., Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1039 (Del. Ch. 2004) ("[H]aving failed to state an underlying claim for breach of fiduciary duty against Morgan Stanley itself, Weil's aiding and abetting claim against HarrisDirect necessarily fails."), *aff'd*, 894 A.2d 407 (Del. 2005); *accord Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *14 (Del. Ch. June 29, 2020).

The Innovate Defendants argue that this claim must be dismissed as to them because "a fiduciary cannot aid and abet the fiduciary breach of another fiduciary."[159] The Innovate Defendants rely on several cases, including *In re Pattern Energy Group, Inc. Stockholders Litigation*, 2021 WL 1812674 (Del. Ch. May 6, 2021), which observed that claims of aiding and abetting breaches of fiduciary duty against persons and entities alleged to be a control group would be subject to dismissal if the plaintiffs were to establish that they constituted a control group owing fiduciary duties. *Id*. at *77; *see OptimisCorp v. Waite*, 2015 WL 5147038, at

---

[159] HC2 Defs.' Opening Br. 48.

*57 (Del. Ch. Aug. 26, 2015) ("In those instances where a fiduciary takes actions that would amount to aiding and abetting by a non-fiduciary, that conduct amounts to a direct breach of fiduciary duties."), *aff'd*, 137 A.3d 970 (Del. 2016); *Higher Educ. Mgmt. Gp., Inc. v. Mathews*, 2014 WL 5573325, at *13 (Del. Ch. Nov. 3, 2014) ("As a separate and independent reason for dismissing the aiding and abetting claim against [the defendant], I note that, as an executive officer . . [the defendant] himself owes fiduciary duties to the corporation, and therefore any conduct of his rising to the level of aiding and abetting would be a breach of his own fiduciary duties.").

Plaintiffs generally do not seem to contest this statement of the law. Instead they argue that the aiding and abetting claim should not be dismissed as to Continental, which denies that it owes fiduciary duties to the Company or its stockholders.[160] But with Continental being dismissed for lack of personal jurisdiction, and the Innovate Entities conceding that they owe fiduciary duties, Plaintiffs' argument is untenable. *See Pattern Energy*, 2021 WL 1812674, at *77 (denying motion to dismiss aiding and abetting claim against members of an alleged control group alleged to owe fiduciary duties where further evidence was necessary to determine whether those defendants constituted a control group); HC2 Defs.'

---

[160] Pls.' HC2 Ans. Br. 28.

Reply Br. 29–30 ("[T]he viability of [the aiding and abetting claim against Continental] has no bearing on the viability of Plaintiffs' aiding and abetting claim against the [Innovate] Entities, all of which are fiduciaries."); Hrg Tr. at 28 (counsel for the Innovate Defendants acknowledging that the Innovate Entities "are alleged and concede that they owe fiduciary duties in their capacity as DTV's controlling stockholder"); *see also Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 281 (Del. Ch. 2021) ("The defendants do not dispute that Apollo was a fiduciary for purposes of the motion to dismiss, and this decision therefore analyzes Apollo's liability as a fiduciary, rather than an alleged aider and abettor.").

The Innovate Entities concede that they owe fiduciary duties to DTV America and the minority stockholders. Therefore, there is no basis to maintain the claims that they aided and abetted the alleged breaches of fiduciary duty of the Director and Officer Defendants. Accordingly, the claims against the Innovate Entities for aiding and abetting the Director and Officer Defendants' alleged breaches of fiduciary duty are dismissed.

### 7. Civil Conspiracy

Count V is asserted by "**All Plaintiffs against All Defendants**" for civil conspiracy. But the specific allegations of Count V show otherwise. The word "conspiracy" appears in the Complaint exactly four times. First, in paragraph 1,

67

which lists civil conspiracy as one of several claims. Second, paragraph 24 mentions the "conspiracy theory of personal jurisdiction" as to Continental. The word conspiracy next appears twice in the body of Count V. After incorporating the preceding 131 paragraphs of the Complaint by reference, the civil conspiracy claim is articulated as follows:

> 133. To the extent any members of the Conspirators were not part of that group from its inception, each one of them at a point in time that they became a member engaged in overt acts in furtherance of the conspiratorial Scheme all of which were willful violations of their fiduciary duties.

> 134. As a result of the conspiracy, the Minority Shareholders have suffered economic injury in terms of substantial devaluation of their stock holdings.

> 135. As a result of the foregoing, Plaintiffs are entitled to direct relief in the form of a damages award against Defendants, including Voigt, in an amount to be determined at trial.

Compl. ¶¶ 133–35. The Complaint alleges the conspiracy against the "Conspirators." The Conspirators are defined as: Falcone, Levi, Sena, Minkov, Barr, and Voigt. The Complaint limits the civil conspiracy claim to the Conspirators. In addition, only minority stockholders are alleged to have suffered any injury from the acts of the Conspirators. Thus, the civil conspiracy claim is not asserted by all Plaintiffs, but rather the Stockholder Plaintiffs, to whom the Complaint refers as the Minority Shareholders. There are no allegations alleging the Option Holder

68

Plaintiffs suffered any injury in their capacities as option holders as a result of the alleged civil conspiracy.

Of the six alleged Conspirators, five are alleged to have served as a director, officer, or both of DTV America, and served in those roles "[a]t the inception of the Scheme."[161] Voigt did not serve as an officer or director of DTV America. Rather, he served as a Senior Managing Director at Innovate from October 2014 to May 2018 and as a "director and/or officer of several of [Innovate's] subsidiaries," none of which the Complaint identifies.[162] Nevertheless, Count V alleges that he and the other alleged Conspirators breached their fiduciary duties.[163]

The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties. *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus.,* 871 A.2d 428, 437 n. 8 (Del. 2005). "Delaware law requires an independent tort underlying a civil conspiracy." *OptimisCorp*, 2015 WL 5147038, at *56; *see also Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998) ("We agree that civil conspiracy is not an independent cause of action in Delaware, and that it must arise from some underlying wrong."). A

---

[161] Compl. ¶ 18.

[162] *Id.* ¶ 14.

[163] *Id.* ¶ 133.

plaintiff may not plead conspiracy to avoid the statute of limitations for the underlying tort. *See Connolly v. Labowitz*, 519 A.2d 138, 144 (Del. Super. Ct. 1986) ("Where there is a succession of wrongful acts done in pursuance of a conspiracy, the statute of limitations commences as to each wrongful act at the time that act occurred.").

As to Falcone, Levi, Sena, Minkov, Barr, the civil conspiracy claim must be dismissed for the same reason as the aiding and abetting claim against the Innovate Entities. Each of these five alleged Conspirators is alleged to have been a DTV America director, officer, or both during the alleged conspiracy. In those capacities they owed, and are alleged to have owed, fiduciary duties to DTV America and the Stockholder Plaintiffs. *See Gantler*, 965 A.2d at 708–09 (recognizing that directors and officers owe the identical fiduciary duties of care and loyalty). Thus, the independent civil conspiracy count against these fiduciaries cannot stand. "However captioned, civil conspiracy is vicarious liability. It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. Therefore, it does not apply to the defendants which owe the [stock]holders a direct fiduciary duty." *Albert*, 2005 WL 2130607, at *11 (footnotes omitted); *OptimisCorp*, 2015 WL 5147038, at *57 ("In the fiduciary duty context, conspiracy is treated essentially as coterminous with aiding and abetting.");*Presidio,* , 251 A.3d 212 at ("This court largely has equated claims for aiding and abetting and civil conspiracy, noting that the two theories often

cover the same ground and that the distinctions usually are not material."). Like the aiding and abetting claim asserted against the Innovate Defendants, the civil conspiracy claim is premised upon conduct by the alleged Conspirators that constituted breaches of their fiduciary duties. Therefore, it must be dismissed.

Although Voigt did not owe fiduciary duties to DTV America or the Plaintiffs, the civil conspiracy claim as to him must be dismissed, as well. The *sole* factual allegations against Voigt individually relate to his meeting with DTV America officials and shareholders starting in 2016 until June 2017.[164] The Complaint alleges that Voigt "was" Innovate's Senior Managing Director, Investments until May 2018. Compl. ¶ 14. It also alleges that Voigt was a "director and/or officer" of other Innovate subsidiaries (it does not clarify which entities). *Id.* Finally, the Complaint alleges that Voigt is or was a director of another Innovate subsidiary not party to this case. *Id.*

The elements of a conspiracy require a "confederation." *OptimisCorp*, 2015 WL 5147038, at *57. "[T]he confederation requirement includes "knowing participation" in the conspiracy. Although there need not be an explicit agreement, plaintiffs still must prove knowing participation in a conspiracy." *Id.* At the pleadings stage, "the Plaintiff must allege that the parties *knowingly* participated in

---

[164] *Id.* ¶ 32.

the conspiracy and that there was coordination of action among the parties." *Lechliter v. Del. Dep't of Nat. Res. Div. of Parks & Rec.*, 2015 WL 7720277, at *11 (Del. Ch. Nov. 30, 2015). This can be accomplished by demonstrating a "meeting of the minds on the object or course of action." *In re Swervepay Acq., LLC*, 2022 WL 3701723 (Del. Ch. Aug. 26, 2022) (quoting *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *11 (Del. Ch. Apr. 29, 2010)).

There are no well-pleaded facts supporting a reasonable inference that Voigt knowingly participated in a conspiracy. The only conduct alleged as to Voigt is that he and Falcone met with DTV America and certain of its stockholders at times from 2016 until June 2017, when the SPA was executed.[165] This was five months before the transaction closed and Innovate became DTV America's controlling stockholder. There are no other allegations as to Voigt. Although it is reasonable to infer that Voigt received the so-called Business Plan in the period before the parties executed the SPA, but there is no well-pleaded allegation that Voigt agreed to anything or coordinated his actions with anyone. *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1037 (Del. Ch. 2006) (dismissing claims against defendants where "the complaint is entirely devoid of facts regarding the role of particular individuals,

---

[165] *Id.*

even by title."). As with all claims, "[f]acts, not legal conclusions, must be pled." *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1066 (Del. Ch. 1989).

Voigt joined the other Defendants' briefs in support of dismissal and independently moved to dismiss for lack of notice as to what he is alleged to have done wrong.[166] Plaintiffs did not address Voigt's argument in their answering brief. *Spring Real Estate, LLC v. Echo/RT Hldgs.*, 2013 WL 6916277, at *7 (Del. Ch. Dec. 13, 2013) ("In this Court, a plaintiff may waive a claim if it does not brief the sufficiency of its allegations in response to a defendant's motion to dismiss."); *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007) (granting motion to dismiss claims after finding that the plaintiffs waived them "by failing to brief them in their opposition to the motion to dismiss").

Plaintiffs fail to state a claim for civil conspiracy against Voigt because they fail to allege that Voigt knowingly participated in any conspiracy. In addition, there is no tort to underly a claim for conspiracy as to him. As such, Plantiffs' claims for civil conspiracy must be dismissed.

### 8. Count VII Fails to State a Claim for Tortious Interference

Finally, the Option Holder Plaintiffs allege that all defendants tortiously interfered with their interests and expectations, including prospective contractual

---

[166] Dkt. 35.

interests, relating to their options.[167]   The Option Holder Plaintiffs assert that defendants wrongfully and intentionally interfered with their ability to financially benefit from the option agreements.[168]

To state a claim for tortious interference with a contract, a plaintiff must allege: (1) a contract, (2) about which the defendant knew, and (3) an intentional act by that defendant that is (4) without justification and is (5) a significant factor causing a breach of the contract and resulting injury. *Agranoff v. Miller*, 1999 WL 219650, at *21 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999).  The Option Holder Plaintiffs allege that a contract existed, defendants were aware of it, defendants acted intentionally, and injury occurred as a result.[169]  The Option Holder Plaintiffs do not, however, allege that any breach of the agreement occurred, whether as a result of defendants' conduct or that of others.  On a motion to dismiss, "[t]he well-pleaded allegations of the complaint are accepted as true . . . [but] such a motion does not concede pleaded conclusions of law or fact where there are no allegations of specific facts which would support such conclusions.  This is of critical significance here." *Weinberger v. UOP, Inc.*, 409 A.2d 1262, 1264 (Del. Ch. 1979).

---

[167] Compl. ¶¶ 147–48.

[168] *Id.* ¶ 146.

[169] *Id.* ¶¶ 145–47.

74

The Option Holder Plaintiffs' allegations fail to fulfill a foundational element of the claim for tortious interference with a contract.

To state a claim for tortious interference with a prospective business opportunity, a plaintiff must allege: "1) the reasonable probability of a business opportunity; 2) the intentional interference by defendant with that opportunity; 3) proximate causation; and 4) damages." *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009). The elements of this claim must be considered "in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981).

The Option Holder Plaintiffs allegations fail the first element. They allege that "Defendants knew of the . . . [Option Holder Plaintiffs'] ability to become stockholders and/or financially benefit from the Option Agreement."[170] The law requires more than a showing of an ability to benefit for such a claim to survive.

This court recently rejected a similar claim on this basis in *Blue v. Fireman*, 2022 WL 593899 (Del. Ch. Feb. 28, 2022). There, Vice Chancellor Zurn succinctly explained that the mere ownership of stock options is insufficient to show a *bona*

---

[170] *Id.* ¶ 146.

*fide* expectancy to support a claim for tortious interference with prospective business relationships:

> Plaintiffs rely exclusively on the conclusory allegation that they had a "reasonable probability of receiving positive value for their options from the Company." This bare statement is insufficient to establish a *bona fide* expectancy. Plaintiffs plead no facts to quantify that expectancy, to support its existence, or to explain why it was reasonable to hold it. Rather, it appears their expectancy is based on a "mere hope" that their options would be in the money. Options, like other derivative securities, inherently involve risk. Plaintiffs' speculation or hope that they picked the right side of their bet is not, standing alone, sufficient to establish a reasonable probability of a business relationship.

*Id.* at *18.[171] That reasoning equally applies here. Accordingly, Count VII is dismissed.

---

[171] In essence, Count VII is an attempt by option holders to turn derivative claims, for which they lack standing to assert, into direct fiduciary duty claims. Plaintiffs concede as much: "the [Option Holder Plaintiffs'] tortious interference claim is . . . predicated on the gross breaches of fiduciary duties, including the purposeful devaluation of DTV America." Pls.' HC2 Ans. Br. 27. "A claim for breach of fiduciary duty must be based on an actual, existing fiduciary relationship between the plaintiff and defendants at the time of the alleged breach." *In re Nine Sys. Corp. S'holders Litig.*, 2013 WL 771897, at *7 (Del. Ch. Feb 28, 2013) (citation omitted). The Option Holder Plaintiffs cannot assert fiduciary duty claims in this case because they are not owed fiduciary duties. A "holder of an option to purchase stock is not an equitable stockholder of the corporation." *Harff v. Kerkorian*, 324 A.2d 215, 219 (Del. Ch. 1974), *rev'd on other grounds*, 347 A.2d 133 (Del. 1975). Therefore, "the option feature of these instruments does not qualify for the protections that flow from a fiduciary duty." *Glinert v. Wickes*, 1990 WL 34703, at *9 (Del. Ch. Mar. 27, 1990), *aff'd*, 586 A.2d 1201 (Del. 1990).

## III.  CONCLUSION

For the foregoing reasons, Continental's motion to dismiss for lack of personal jurisdiction is granted.  The Innovate Defendants and the Individual Defendants' motions to dismiss Counts I through IV are granted in part and denied in part, and as to Counts V through VII are granted in their entirety.

**IT IS SO ORDERED.**